Woralak KALYAWONGSA; Udo Liell, Plaintiffs–Appellants,

Philip P. Durand; E. Michael Morris, Attorneys–Appellees,

v.

Margaret Jean MOFFETT, et al., Defendants.

No. 96–5045.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 5, 1996.

Decided Jan. 23, 1997.

Larry L. Crain (argued and briefed), Long, Seneff & Mellow, Brentwood, TN, for plaintiffs–appellants.

Philip P. Durand, Ambrose, Wilson, Grimm & Durand, Knoxville, TN, E. Michael Morris (argued and briefed), Morris & Doherty, Birmingham, MI, for attorneys–appellees.

Before: ENGEL, MERRITT, and MOORE, Circuit Judges.

MERRITT, Circuit Judge.

This appeal arises from an unfortunate, protracted dispute over legal fees between the plaintiffs in a housing discrimination case and their former counsel. After being forced to withdraw before the housing discrimination claims were settled, the lawyers successfully moved for liens on the property acquired in the underlying litigation. On appeal, the former plaintiffs argue (1) that the district court did not have jurisdiction over the fee dispute, (2) that the dispute is governed by Tennessee law which does not allow the court having jurisdiction to "enforce" such liens by determining their amount, (3) and that even if the court had the power to grant the fees they were excessive and unreasonable and violated the plaintiffs' contracts with the attorneys. The clients also argue that the testimony of a lawyer for the Department of Housing and Urban Development was inadmissible under the attorney-client privilege. For the reasons given below we disagree and affirm the district court's order.

## FACTS

This case began as a fair housing action brought by appellants Udo Liell and Woralak Kalyawongsa, a married couple, against Margaret Leinart, the seller of property in Sevier County, Tennessee. In 1991, Leinart offered

a tract of land for sale through a real estate agent for $235,000. Kalyawongsa offered to purchase the property for $200,000 cash; Leinart counteroffered for $250,000. Kalyawongsa then attempted to accept this counteroffer by responding verbally and by facsimile to both of Leinart's agents. About one and a half hours later, Leinart withdrew her counteroffer. Leinart later explained to one of the agents that she disapproved of a "mixed couple" buying her property. (Mr. Liell was a citizen of Germany; Ms. Kalyawongsa was from Thailand).

After at least one preceding lawyer withdrew from the case, Liell and Kalyawongsa hired Philip Durand of Knoxville to represent them in both a suit filed in federal district court (the instant case) and a specific performance action in Tennessee chancery court. Under their written retainer agreement, Liell and Kalyawongsa were to pay Durand an hourly rate of $175 per hour. Durand estimated, but did not guarantee, that the total representation would cost approximately $25,000. Retainer Agreement (J.A. at 573).

Liell and Kalyawongsa assert that Durand received a written settlement offer but failed to communicate it to them and that the trial was continued twice at Durand's request due to his procrastination. They also claim that Durand delayed taking Leinart's deposition despite her failing health. Eventually, Leinart died, and the plaintiffs renewed the suit against her estate through its executrix, Margaret Jean Moffett.

Approximately one year after hiring Durand, Liell and Kalyawongsa decided to engage E. Michael Morris of Birmingham, Michigan, to serve as co-counsel. Durand and Morris say that their clients sought out Morris because they read of a large jury verdict he had obtained in Michigan. The clients assert that they hired Morris to make up for Durand's lack of progress. The price of the litigation increased at that point because they added to their fee agreement with Durand a written agreement with Morris which included a $5000 retainer and a contingent fee of either 25% of any award or a negotiable fee of approximately 18% if the

case was settled within two weeks prior to trial.

Morris ultimately performed most of the work of taking depositions and preparing for trial. Because of this extra burden, he later requested and received a new fee arrangement. Under this amendment, he was to receive $75 per hour (one half of his hourly rate) in addition to the original contingent fee. No change was made in Durand's retainer agreement which remained in effect.

After Durand had acted as counsel on the case for slightly more than two years, and Morris for a year, Durand and Morris withdrew. They say that they were forced to withdraw because Liell and Kalyawongsa refused to recant allegations of misconduct. The district court granted Durand and Morris' motion to withdraw and granted them attorneys' liens "on the plaintiffs' files and any recovery in this action as allowed under Tennessee law to ensure payment of outstanding fees and expenses incurred."

In 1994, after hiring their current counsel, at least the fourth lawyer in the case, Liell and Kalyawongsa settled the case in conjunction with a court-supervised mediation. They received the land that they originally sought to buy. The Leinart estate agreed to convey the property to them for $165,000. Because the original contract had been for $250,000, their net benefit was an $85,000 reduction in price plus acquisition of the land.

Although Congress has authorized the district courts to award reasonable attorneys' fees to prevailing parties in civil rights litigation, 42 U.S.C. § 1988 (1996), and in suits under the Fair Housing Act, 42 U.S.C. § 3613(c)(2) (1996), Liell and Kalyawongsa apparently did not seek them here. Durand and Morris assert that this was a strategic move to deprive them of fees.

Upon hearing of the settlement, Durand and Morris, who had been forced out of the case without being paid, immediately recorded their lien in the local Register of Deeds' office and then filed a "Motion to Enforce Attorneys' Liens Previously Granted by Court" (J.A. at 102). The district court granted the motion but referred the case to a magistrate to determine the exact amount of

the fees.[1] The magistrate recommended that the court award Durand the full amount sought ($21,706.21) based on his contract with the plaintiffs and the fact that they offered no expert testimony to refute Durand's evidence that $175.00 per hour was reasonable. Report and Recommendation at 8–9 (J.A. at 290–91). He recommended an award of $34,428.50 for Morris, based on the contract for one half of his hourly billings, plus an 18% contingent fee. *Id.* at 14–15 (J.A. at 296–97). The magistrate chose 18% instead of the contractual 25% "because the case was settled prior to trial, and in view of the fact that no one was blameless in this debacle." *Id.* at 14 (J.A. at 296). After reviewing the magistrate's Report and Recommendation *de novo* in light of Liell and Kalyawongsa's objections, the district judge accepted the magistrate's recommendations. Memorandum Opinion (J.A. at 353). Liell and Kalyawongsa now appeal that decision to this Court.

## ANALYSIS

### I.

Liell and Kalyawongsa contend that the district court did not have the power to award either Durand or Morris a judgment for attorneys' fees in the form of an attorneys' lien. First, they argue that the court wrongly exercised supplemental jurisdiction over the attorneys' fees dispute because it arises under state law and is unrelated to the underlying fair housing litigation. Federal courts have the power to exercise supplemental jurisdiction over related claims that form part of the same case or controversy. 28 U.S.C. § 1367(a) (1996). Though part of the Judicial Improvements Act of 1990, § 1367 incorporates the prior doctrines of ancillary and pendent jurisdiction and the cases interpreting and applying them. *See Ahearn v. Charter Township of Bloomfield,* 100 F.3d 451, 454 (6th Cir.1996).

This circuit has not yet directly addressed whether federal courts have supplemental jurisdiction over fee disputes in cases such as this. *Krause v. Rhodes,* 640 F.2d 214 (6th Cir.1981), *cert. denied,* 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981), held that federal district judges have "broad equity power to supervise the collection of attorneys' fees under contingent fee contracts." *Id.* at 218. But *Krause* does not fully resolve the instant question for two reasons. First, the contracts in *Krause* involved only contingent fees, which are especially deserving of judicial supervision. *See U.S. ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1047 (6th Cir.1994); *McKenzie Const., Inc. v. Maynard,* 758 F.2d 97, 101 (3d Cir.1985). The contracts which we must address in the instant case contain a mixture of contingent and hourly fees. Second, *Krause* involved a fund created by the lawyer seeking fees, and is thus more similar to mass tort and securities cases involving the "common fund" doctrine than the instant case. In common fund cases, the size of the fee lawyers receive often directly influences the percentage of the fund that claimants receive. Often, these cases involve class members who are not in a position to review or question the size of the fees obtained by the lawyers who nominally represent them. Thus, the reasons for retaining jurisdiction are particularly strong in such common fund cases.

Nevertheless, other circuits have allowed supplemental jurisdiction over attorneys' fees disputes that do not involve common funds and that would otherwise fall under state contract law. In *Cluett, Peabody & Co. v. CPC Acquisition Co.,* 863 F.2d 251 (2d Cir. 1988), a law firm sought attorneys' fees from a corporate takeover artist. The underlying suit, which arose from the takeover itself, involved an attempt to prevent the target

---

1. The court held:

   [T]he motion to enforce attorneys' liens previously granted by the court is hereby GRANTED to the extent that this court DECLARES that Plaintiffs' former counsel is entitled to have statutory and equitable attorneys' liens attach to the real property at issue.... However, to the extent that plaintiffs' former coun-

   sel requests that this court decide the precise amount of attorneys' fee to be imposed as an attorneys' lien, then the court hereby REFERS this matter to the ... Magistrate Judge, for a Report and Recommendation, if necessary.

   Memorandum and Order at 6–7 (J.A. at 239–40).

company from implementing a "poison pill" defensive tactic. The Second Circuit affirmed the district court's exercise of ancillary jurisdiction over the fee dispute, noting that "it is well settled that a federal court may, in its discretion, exercise ancillary jurisdiction to hear fee disputes between litigants and their attorneys when the dispute relates to the main action." *Id.* at 256 (quoting *Petition of Rosenman Colin Freund Lewis & Cohen,* 600 F.Supp. 527, 531 (S.D.N.Y.1984)) (internal quotation marks and ellipses deleted).

The Ninth Circuit reached a similar result in *Curry v. Del Priore,* 941 F.2d 730 (9th Cir.1991), a Title VII case:

> Courts have long recognized that fee disputes arising from litigation pending before a district court fall within that court's ancillary jurisdiction. Ancillary jurisdiction permits courts to adjudicate matters that arise during the course of an action and affect the court's ability either to render an efficacious judgment or to control the litigation before it. . . .
>
> The district court's inherent authority to regulate members of its own bar reinforces the propriety of its exercise of ancillary jurisdiction in this case.

*Id.* at 731–32.

The Tenth Circuit in *Jenkins v. Weinshienk,* 670 F.2d 915 (10th Cir.1982), agrees:

> Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety. Incident to the disposition of the principal issues before it, a court may decide collateral matters necessary to render complete justice.
>
> Determining the legal fees a party to a lawsuit properly before the court owes its attorney, with respect to the work done in the suit being litigated, easily fits the concept of ancillary jurisdiction.

*Id.* at 918.

The Third Circuit expressed a similar view in *Novinger v. E.I. DuPont de Nemours & Co.,* 809 F.2d 212 (3rd Cir.1987), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987), a diversity, non-class-action, products liability case. Its concern with the effect of substitution of counsel is particularly relevant to the instant case:

> Attorneys' fee arrangements in diversity cases, and in most federal question cases as well, are matters primarily of state contract law. Nevertheless the federal forum has a vital interest in those arrangements because they bear directly upon the ability of the court to dispose of cases before it in a fair manner . . . . Moreover, in the context of contingent fee litigation the nature of such disputes is such that they cannot be resolved at the time the court acts to permit substitution of counsel. At that point in the lawsuit the reasonable value of the attorney's services cannot be determined because it must be measured, at least in part, against the results obtained. Thus the rule of necessity with respect to attorney-client disputes growing out of the substitution of attorneys in the course of litigation must be broad enough to permit the resolution of those disputes after the underlying case has been resolved by judgment or settlement.

*Id.* at 217.

Thus, other circuits have granted supplemental jurisdiction over attorneys' fees disputes that do not involve the common fund doctrine. *But see Bounougias v. Peters,* 369 F.2d 247, 249 (7th Cir.1966) (holding that ancillary jurisdiction does not apply in fee dispute arising from personal injury case), *cert. denied,* 386 U.S. 983, 87 S.Ct. 1288, 18 L.Ed.2d 232 (1967).

■ The reasoning of the Second, Third, Ninth, and Tenth Circuits is sound. Lawyers are officers of the court. Their fees are part of the overall costs of the underlying litigation. Resolution of related fee disputes is often required to provide a full and fair resolution of the litigation. Unlike a state court judge hearing a separate contract action, a federal judge who has presided over a case is already familiar with the relevant facts and legal issues. Considerations of judicial economy are at stake. Thus, we hold that although attorneys' fee arrangements are contracts under state law, the federal court's interest in fully and fairly resolving the controversies before it requires courts to

exercise supplemental jurisdiction over fee disputes that are related to the main action. The fact that the district court here incorporated the fee awards into the judgment by essentially perfecting a lien which it had the power to declare does not change this jurisdictional analysis.

## II.

The second component of the plaintiffs' challenge to the district court's power rests on their claim that under Tennessee law, although a court may "declare" an attorney's lien, it must leave all "enforcement" of the lien to a later action based on the general state law regarding liens.

The district court's action in this case, to which plaintiffs object, lies between the mere declaration of a lien and its final enforcement. Under Tennessee law a court with jurisdiction clearly may simply declare the existence of an attorneys' lien. *Chumbley v. Thomas*, 184 Tenn. 258, 198 S.W.2d 551, 552 (1947); Note, *Attorney v. Client: Lien Rights and Remedies in Tennessee*, 7 MEM. ST. U.L.REV. 435, 447–48 (1977). Kalyawongsa and Liell do not dispute this. At the other extreme, though the clients in this case occasionally characterize the district court's action as an "enforcement" of the lien, by "enforcement" they cannot mean foreclosure and sale: Neither of these actions took place in the instant case. Rather, the clients' primary objection seems to be to the district court's valuation of the lien by determining the precise amount of fees due.

■ We have held above that the district court had supplemental jurisdiction over this question as a matter of federal law and that jurisdiction includes the authority to determine the amount of the lien. Contrary to the plaintiffs' contentions, the local law of Tennessee reaches a similar result. In *Palmer v. Palmer*, 562 S.W.2d 833 (Tenn.Ct.App. 1977), the lawyers representing Mrs. Palmer in a divorce case obtained a lien on real estate the court had awarded to Mr. Palmer. The court noted:

> There is a situation in which a Trial Court may, to a degree, rule upon the rights of counsel against his client, and that is when counsel seeks the declaration and enforcement of his lien against the funds or property recovered by his efforts. In such event, the Trial Court must perforce determine the extent (amount) of the lien to be enforced.

*Id.* at 839. Thus under *Palmer* a Tennessee court may determine the amount of the lien and reduce it to judgment.

*Steel v. Chester*, 2 Tenn. Cas. (2 Shannon) 292 (1877), and *Perkins v. Perkins*, 56 Tenn. (9 Heisk.) 95 (1871), are not to the contrary. Both older cases contain language suggesting that courts should in certain circumstances only declare liens, leaving lawyers to enforce them in separate actions, but neither case contemplates this result when the amount due is fixed by contract. *Steel*, 2 Tenn. Cas. at 293; *Perkins*, 56 Tenn. at 97–98.[2] Though the clients contend that they should not have to pay the full amounts due under the written contracts at issue, it is clear that contracts apply and are the starting point here. A court having the power to declare an attorneys' lien may also declare the precise amount of the lien. The same considerations that support supplemental jurisdiction also support some resolution, in the same court, of the attorneys' rights and the extent of their claim.

2. The plaintiffs' brief quotes *Perkins* as stating: "If the client be *sui juris*, and does not agree with the attorney as to the amount of the fee, . . . the court should do no more than declare the lien, leaving the attorney to enforce his claim by an appropriate proceeding against his client." Appellant's Br. at 18 (ellipses in original). This excerpt is misleading in its lack of completeness. The actual passage from the reporter cited by the plaintiffs reads:

> Where the client is *sui juris* we think the court should, in the cause in which the services were

rendered, do no more than declare the lien; and if the amount be not settled between them by contract, leave the attorney to enforce his claim by an appropriate proceeding against his client, *unless the amount be settled by contract, in which case the court may enforce the lien by decree.*

*Perkins v. Perkins*, 56 Tenn. (9 Heisk.) 95, 97–98 (1871) (emphasis added). In failing to disclose the full statement, counsel has forgotten his obligation as an officer of the court and overstepped the bounds of advocacy.

## III.

Liell and Kalyawongsa argue that even if the district court had the power to create a lien for attorneys' fees in a specific amount, the amount awarded was excessive.

██ The same equitable rationale that gives courts power over fee disputes arising from cases before them also allows courts to look into the reasonableness of fee arrangements. The burden of demonstrating reasonableness should be on the lawyers. Tennessee law is consistent with this view. *Adams v. Mellen,* 618 S.W.2d 485, 490 (Tenn. Ct.App.1981) (creating a lien on settlement in wrongful death suit and holding that the burden of demonstrating reasonableness lies with attorneys). Our standard of review on appeal gives deference to the district court. *Dean v. Holiday Inns, Inc.,* 860 F.2d 670, 672 (6th Cir.1988) ("We usually sustain a district court's award and division of attorneys' fees absent an abuse of discretion.").

██ Liell and Kalyawongsa argue that the fee awards are unreasonable for several reasons. First, they place significance on the fact that the aggregate attorneys' fees (including those already paid and those not based on contingent fee agreements) represent 128% of what they label as the "recovery"—the $85,000 discount obtained in the settlement. But the recovery in this case also included acquiring the land as well as the $85,000 reduction in price. Without the lawsuit, it is unlikely the clients would have gotten the land at all, much less at a price $85,000 below what they had offered to pay. Taking into account the succession of at least four lawyers in the case, the legal fees, though steep, are not unconscionable.

Second, Liell and Kalyawongsa argue that Durand violated his fiduciary duties to them. According to the clients, Durand procrastinated on several occasions, forcing them to hire Morris to rescue the case. But this claim is unproven, and the district court did not credit it. It is true that Durand failed to take the deposition of the defendant, Mrs. Leinart, despite their requests and despite Leinart's failing health, but Durand responds that he deliberately avoided taking Leinart's deposition on the theory that it would only preserve her inevitable denials of the discrimination allegations. Liell and Kalyawongsa also argue that Durand violated his fiduciary duties by failing to inform them of a settlement offer, and by holding their files hostage after his withdrawal. Durand does not directly address either of these contentions in his brief, though the hostage file issue was litigated thoroughly at the time. Instead, Durand responds that the clients have failed to demonstrate prejudice to their case from this breach. The clients' contentions raise some questions about the quality of Durand's representation, but we do not believe they rise to the level of a breach of fiduciary duty. The magistrate and district court examined Durand's fees with particularity and found no such violation. We do not disagree.

Third, the clients contend that Morris' fees violate the Tennessee rules on contingent fees. They argue that Morris failed to inform them of the consequences that would result from a settlement that was less than the aggregate fees (in particular the possibility that the total fees could exceed their net benefit) and that because they could have paid a reasonable fixed fee, a contingent fee was improper. But this argument does not take into account the fact that only a portion (18% of $85,000, or $15,300) of the total fees is attributable to contingent fees. The contingent portion of the fee is not excessive. It is true that the $55,000 in fees awarded to Durand and Morris is high, but one must take into account that the plaintiffs were difficult clients who ended up employing at least four different lawyers to handle this case. Retaining new counsel four times is not calculated to save litigation costs.

Liell and Kalyawongsa rely on *Alexander v. Inman,* 903 S.W.2d 686, 697 (Tenn.Ct.App. 1995) for the proposition that "an attorney should generally not propose a contingent fee arrangement to a client who is able to pay a reasonable fixed fee," but *Alexander* was a divorce case and states a principle not generally applicable in ordinary tort and contract cases. The relevant canon of professional ethics, as promulgated by the Tennessee Supreme Court, says that "it is not necessarily improper for a lawyer, where justified by the

particular circumstances of a case, to enter into a contingent fee contract in a civil case with any client who, after being fully informed of all relevant factors, desires that arrangement." Tenn.S.Ct. R. 8, EC 2–20. We are satisfied that Liell and Kalyawongsa were sufficiently informed of the relevant factors. It is true that Durand's estimate of $25,000 was significantly below the eventual total fees of all counsel combined. But the record indicates that Liell was a difficult client whose own actions contributed to the size of the fees. Durand could not reasonably have anticipated this difficulty at the time of his estimate. Though Liell and Kalyawongsa may or may not have had some legitimate grounds for dissatisfaction, they do not dispute Durand and Morris' time records, and the district court found no evidence of wrongdoing and nothing unreasonable about the written contracts themselves. Given these circumstances, we do not believe the district court's disposition of the case should be upset.

■ In addition, Liell and Kalyawongsa argue that under their contract with Morris, attorneys' fees to local counsel were supposed to be deducted from the award before the calculation of the contingent fee. This argument stems from language in a confirmation letter from the plaintiffs to Morris stating that "[a]ttorney's fees awarded to local counsel are excluded from the award to determine contingent." Letter from Liell and Kalyawongsa to Morris (Mar. 17, 1993) (J.A. at 572). Given the availability of attorneys' fees in civil rights actions under 42 U.S.C. § 1988, this language contemplates clearly the possibility that a separate attorneys' fee award would be construed as part of the plaintiffs' recovery, and hence itself subject to the contingent fee. This language is inapplicable here.

In sum, though we share the magistrate's view that "no one was blameless in this deba-

cle," Report and Recommendation at 14 (J.A. at 296), we also agree with the district court's finding that Durand and Morris are entitled to fees, and can find no abuse of discretion in the district court's enforcement of the written contract between the parties or the adoption of the magistrate's calculation of fees.

## IV.

Liell and Kalyawongsa raise one evidentiary issue on appeal. They assert that the testimony of a lawyer for the Department of Housing and Urban Development based on conversations at Morris' office is protected by the attorney-client privilege. *See* Tenn. Code.Ann. § 23–3–105.[3] However, the magistrate and district court found that because the clients had filed charges against Durand and Morris with the Tennessee Disciplinary Board, the exception found in DR 4–101(C)(4) of Tennessee Supreme Court Rule 8 applies. Memorandum Opinion at 5–6 (J.A. at 357–58). That section allows a lawyer to reveal "confidences or secrets necessary to establish or collect the lawyer's fee or to defend the lawyer or the lawyer's employees or associates against an accusation of wrongful conduct." Tenn.S.Ct. Rule 8, DR 4–101(C)(4).

■ We need not decide whether the attorney for HUD had an attorney-client relationship with Liell and Kalyawongsa: In either case, the privilege does not apply. If the attorney for HUD represented the government but not Liell and Kalyawongsa, there was no attorney-client relationship, and the communications at issue are not privileged. *See* Tenn.Code Ann. § 23–3–105. On the other hand, if he did represent the plaintiffs as well as the federal government, then the exception to the privilege relied upon by the district court applies. *See* Tenn.S.Ct. Rule 8, DR 4–101(C)(4). Liell and Kalyawongsa respond that the conversations that

---

3. Tennessee's version of the attorney-client privilege reads:

> **23–3–105. Privileged communications.—** No attorney, solicitor or counselor shall be permitted, in giving testimony against a client, or person who consulted him professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such

person, during the pendency of the suit, before or afterwards, to the person's injury.

Tenn.Code Ann. § 23–3–105 (1996). Though this is the complete statutory exposition of the privilege, it codifies the common law principle. *Johnson v. Patterson*, 81 Tenn. (13 Lea) 626, 649 (1884).

were the subject of their objection had nothing to do with attorneys' fees, but this argument is meritless. There is no requirement that the communications relate directly to fees, only that they be necessary to establish the fee or defend against accusations of wrongful conduct. *Id.*

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.